DRAFT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                :

FERLANDE MILORD-FRANCOIS,         :
                                :
                                :
                   Plaintiff,      :       19-cv-00179 (LJL)
        -v-                  :
                                :       OPINION & ORDER
THE NEW YORK STATE OFFICE OF THE  :
MEDICAID INSPECTOR GENERAL, DENNIS :
ROSEN, JANINE DANIELS-RIVERA, and JOHN and :
JANE DOE                           :
                                :
                   Defendants.     :
                                :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

BACKGROUND

     Plaintiff Ferlande Milord-Francois ("Plaintiff" or "Milord-Francois") brings this action

under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000, *et seq.* ("Title

VII"); the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983") and the Equal Protection

Clause of the Fourteenth Amendment of the United States Constitution; the New York Human

Rights Law, as contained in New York State Executive Law § 296, *et seq.* ("NYSHRL"); and the

New York City Human Rights Law, as contained in the Administrative Code of the City of New

York § 8-107, *et seq.* ("NYCHRL").  She alleges that her employer, the New York State Office

of the Medicaid Inspector General ("OMIG") ignored her complaints that she was being

subjected to racist behavior by a subordinate, and that it subsequently retaliated against Plaintiff

by giving her poor performance reviews and demoting her.  Defendants moved for summary

judgment on all claims.  For the reasons that follow, the Court grants the motion as to Plaintiff's

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__9/23/2020__

federal claims and those brought under NYSHRL, and declines to exercise supplementary jurisdiction over Plaintiff's claims brought under NYCHRL.

## I.      The Parties

Plaintiff Milford-Francois is a black attorney of Haitian decent who has worked as an attorney at the OMIG Office of Legal Counsel since 2010.  Dkt. No. 1 ("Complaint" or "Compl.") at 7-8.

Defendant OMIG is an independent office within the New York State Department of Health which was established to prevent, detect, and investigate fraud and abuse within the New York State medical assistance program (Medicaid) and recover improperly expended Medicaid funds.  Dkt. No. 88 ("Pl. 56.1") ¶ 1.  OMIG's organizational structure consists of six divisions, including the Executive Office, the Division of Medicaid Audit, the Division of System Utilization and Review, the Division of Administration, the Division of Medicaid Investigations, and the Office of Counsel.  The Office of Counsel supports each of the other OMIG divisions for both Medicaid and non-Medicaid legal matters.  *Id*. ¶ 3.  The staff within the Office of Counsel includes a General Counsel, Deputy Counsel, Associate Counsel, Associate Attorneys, Senior Attorneys, and administrative support staff.  *Id*. ¶ 4.

Defendant Dennis Rosen ("Rosen") has served as the Medicaid Inspector General since March 2015.  *Id*. ¶ 2.  Defendant Janine Daniels-Rivera ("Daniels-Rivera" or "JDR"), who is a black woman, has been General Counsel of OMIG since 2009, and is responsible for management and supervision of the office.  *Id*. ¶ 8; Dkt. No. 80 ("JDR Decl.") ¶ 2.[1]

---

[1] Although the Complaint names John and Jane Doe, those defendants have never been identified.

## II.        Plaintiff's Probationary Promotion to Senior Attorney

Drawing all reasonable inferences in favor of Plaintiff, [2] the evidence before the Court establishes the following:

Plaintiff was hired as a Senior Attorney at the Office of Counsel at OMIG's New York City office on or about July 2010.  Pl. 56.1 ¶ 7.  In August 2015, Plaintiff was promoted on a probationary basis to the role of Associate Attorney position, which is a supervisory position to the position of Senior Attorney.  At the same time, another OMIG Senior Attorney, Barry Mandel ("Mandel"), who is a white man, was also promoted to the same position, also on a probationary basis.  The promotions were made at the recommendation of Daniels-Rivera and were approved by Rosen.  The promotions were subject to a probationary period of 12 to 52 weeks, which began on August 13, 2015.  JDR Decl. ¶ 16; *Id*. Ex. E.

The two were selected ahead of candidates from outside OMIG who had equal or greater experience and scored higher on the Civil Service Exam.  Pl. 56.1 ¶ 13.  In completing OMIG's Nomination for Appointment or Promotion form recommending that Plaintiff be promoted to the Associate Attorney position, Daniels-Rivera noted that Plaintiff "does not have any experience supervising attorneys" and that "her interview was not superior to that of other candidates."  JDR Decl., Ex. C.  In addition, while every non-OMIG candidate scored 100 on the Civil Service Exam, Mandel scored a 90 and Plaintiff scored an 80.  Pl. 56.1 ¶ 13.  Nonetheless, Daniels-Rivera, in recommending Plaintiff's promotion, stated that:

> Given her presence within the agency, and familiarity with the work of the office, the decision is being made to invest in our own. . . . the decision is based on the fact that it is believed that this individual has the potential to become an effective supervisor.  Furthermore, she should be given the opportunity to be trained to

[2] The Court construes the evidence in Plaintiff's favor.  In many cases, aspects of Plaintiff's testimony are disputed by the testimony of Defendants or other witnesses.  For purposes of this motion, the Court disregards such evidence.

3

determine if she can develop the skills necessary to become an effective supervisor, and make the transition from colleague to supervisor, within the Office of Counsel.

JDR Decl., Ex. C.

The Associate Attorney worked "[u]nder direction of the General Counsel [of OMIG]"—Daniels-Rivera—and "report[ed] directly to the Deputy Counsel," JDR Decl., Ex. A, who at all relevant times was Harry Glick ("Glick"), Compl. ¶ 36. The responsibilities included, among other things, providing "supervisory review, support and training to Senior Attorneys in the Office of Counsel." *Id*. Plaintiff was assigned to supervise Tina Dolman ("Dolman") and Nancy Pak ("Pak"). Pl. 56.1 ¶ 18-19.[3]

As elaborated below, Plaintiff had difficulty adjusting to her job, received two unsatisfactory probation reports from Daniels-Rivera in July and September 2016, and was demoted back to the position of Senior Attorney in September 2016. Mandel remained an Associate Attorney.

### III.    Plaintiff's Allegations of Discriminatory Treatment by Robyn Henzel

Plaintiff's claims of discrimination originate from her interactions with Robyn Henzel ("Henzel") and Henzel's alleged conduct. From January 2015 to August 2016, Henzel was a Senior Attorney in the Office of Counsel for OMIG, the position Plaintiff had held before her probationary promotion and which was subordinate to Associate Attorney. Dkt. No. 100 "Def's counter-56.1" ¶ 61.

From Milord-Francois' deposition testimony, which the Court accepts as true on the motion for summary judgment, she and Henzel had a tense, unfriendly relationship. Plaintiff was not the only person to have a difficult time with Henzel, whom several OMIG attorneys

---

[3] According to Plaintff, Glick was also asked to supervise Pak and her supervision of Pak was therefore limited. Pl. Tr. at 90:20-22; 152:4-17.

reported to be difficult to work with and to be around and to have acted in a discriminatory or hostile manner.  Def's counter-56.1 ¶¶ 62-64.

Plaintiff testified to several incidents.  A "couple of months" into Henzel's employment, Plaintiff entered Henzel's office after she heard "shouting" during a witness preparation and concluded that the preparation was not going well.  Plaintiff offered to help Henzel and told the witness that Henzel was new.  The intrusion resulted in a complaint, as Glick reported to Plaintiff that Henzel had complained that Plaintiff was bullying her and undermining her witness preparation.  Plaintiff apologized.  See Dkt. No. 95-1 ("Pl. Tr.") at 36:3-37:17, 42:8-14.  In March 2016, Henzel complained to Daniels-Rivera that Dolman (then Plaintiff's supervisee) had made what Henzel considered to be an anti-Semitic comment about her, stating during a witness preparation that she (Dolman) was going to pray for Henzel.  Daniels-Rivera asked Plaintiff to address the issue.  She did so by telling Dolman that she should speak to Glick rather than by talking to Henzel herself because she believed that Henzel had "a tendency to lie."  *Id.* at 37:21-41:23.

There were tensions over Plaintiff's promotion.  After Plaintiff was promoted, Henzel complained to Plaintiff that she (Henzel) had performed better on the civil service exam than Plaintiff but that Plaintiff was promoted instead.  *Id.* at 45: 8-45:23.  Henzel also complained to Plaintiff that although Plaintiff spoke "well," she (Henzel) should have been promoted instead. *Id*. at 51:6-10.

Plaintiffs also testified to several incidents where she believed Henzel made comments that took on racial overtones.  In June 2015, five months into Henzel's employment and prior to Plaintiff's probationary promotion, Henzel and Plaintiff were in a discussion with several coworkers.  In Plaintiff's presence, Henzel stated that she was attending a funeral in Harlem for

the father of a former colleague and that if she did not return, it was because something had happened to her and "they" had killed her. *Id.* at 211:6-212:3. A white paralegal who was part of the conversation responded that he lived in Harlem. Henzel responded: "[W]ell, you live in Harlem, like you live in Harlem, you live by them." *Id.* Plaintiff understood the remark to be a reference to the majority Black residents of Harlem. *See id.*

The following month, during the ticker tape parade in New York honoring the United States women soccer team's victory in the World Cup, and while a group of employees were watching outside of the office, Henzel walked up to Plaintiff and "out of the blue, sa[id], oh my God, your black face, your black face scares me" and said "like you're scary, you['re] angry, your angry black face." Two coworkers were nearby. *Id.* at 43:20-44:19. Of those, one remembered the remark but remembered both the location where the comment was made and its content slightly differently. Dolman remembered Henzel standing outside Plaintiff's office and stated "'now I know why you're such an angry black woman and you have such a bad attitude.'" Dkt. No. 95-19 ("Dolman Tr.") at 72:6-23. She testified further that "[a]fter that incident I had to go for a walk with [Plaintiff] because she was so upset that she needed to cool down." *Id.* 73:10-11.

There were other instances of hostility. Henzel "implied" that Plaintiff had a drug issue; on one occasion when Plaintiff entered a co-worker's office to get an aspirin, Henzel approached her and asked, "[O]h, are you getting drugs in there?" Pl. Tr. at 52:4-9. According to Plaintiff, another employee subsequently approached Plaintiff and said she was concerned that Plaintiff was taking drugs, from which Plaintiff inferred that a rumor had been spreading that she was taking drugs. *Id.* at 52:15-52:22.

There is no evidence that Henzel ever repeated the comment about "angry black face." Plaintiff did testify—without elaboration or detail—that Henzel "continuously" accused Plaintiff of having an "angry face."  *Id.* at 70; *see id.* at 64:7-9.  There is undisputed evidence that Henzel also remarked that a white female attorney "makes angry faces."  Dkt. No. 95-27 at OMIG 2521. Plaintiff believed that Henzel on her own time was conducting "background checks" on Plaintiff and another employee who was black (essentially, private internet searches), but it is also undisputed that Henzel did those searches on "[e]very person that worked in [the New York Office of Counsel at OMIG]."  Dkt. No. 95-26 at 63:6-23, 64:3-6.

Two other employees also complained about Henzel's conduct; one of those employees was white and the other was black.  In August 2015, a black legal secretary named Latwanda Manson ("Manson") filed a complaint after Henzel threatened to call security on Manson on the purported grounds that Manson verbally disrespected Henzel.  Pl. 56.1 ¶ 76.  In early February 2016, Dolman, Plaintiff's supervisee, who was white, filed a complaint against Henzel based on confrontations with Henzel apparently outside of work and asked for Henzel to be counseled.  *Id.* ¶ 86.  Dolman's complaint was investigated by Director of Labor Relations Matt Chiesa ("Chiesa") who found, *inter alia*, that "[w]hile it seems clear that Ms. Dolman feels threatened and/or intimidated by Ms. Henzel, the behavior described in her report, while strange and off-putting, does not seem to threaten physical harm, either directly or indirectly."  *Id.* ¶ 87.

**IV.    Plaintiff's Complaints and Reports to Others about Henzel's Conduct**

Plaintiff did not report the "angry black face" comment to anyone at the time the comment was made.  Pl. Tr. at 45: 3-45:4.  There is also no evidence that she initiated any complaint to any manager about Henzel.

In March 2016, Plaintiff agreed to be telephonically interviewed by Director of Labor Relations Chiesa as part of his investigation of Dolman's workplace complaint.  *See* Pl. 56.1 ¶

92; Dkt. No. 95-14.  After interviewing Plaintiff about Dolman's complaint, Chiesa asked Plaintiff whether there was anything going on at the office with respect to Henzel.  Plaintiff responded by telling Chiesa that Henzel had acted in a "discriminatory manner" and reported to him that Henzel had called her "black face" and "angry face" and had conducted "background checks."  Plaintiff stated that she "basically . . . ignored [Henzel] at the time," a silence she privately ascribed to the fact that Henzel did not have any power over her.  Pl. Tr. at 67:14-69:15.  Other than that instance, which was initiated by Chiesa, Plaintiff did not report any retaliation or harassment to Chiesa.  *Id*. at 69:20-70:20.  Plaintiff did not follow up with Chiesa or report to anyone in HR what she said to Chiesa until after her demotion.  *Id.* at 71:6-72:3.

On May 5, 2016, Plaintiff and Henzel had an altercation after Plaintiff—with Mandel's permission—attempted to assign work to Henzel that Henzel refused to accept.  The following day, Daniels-Rivera initiated a meeting with Plaintiff, also attended by Glick and Mandel, to discuss what Plaintiff could have done differently to avoid Henzel's reaction.  Def's counter-56.1 ¶¶ 131-132; Pl. Tr. at 54:14-55:6.  Glick, Mandel, and Plaintiff all complained about Henzel's conduct generally and Mandel noted that Henzel had the support of Rosen.  Pl. Tr. at 56:10-56:21.  Plaintiff told Daniels-Rivera that there was nothing Plaintiff could have done about Henzel's refusal to accept the work, stating that "this girl has a problem with me. . . . [S]he asked me, how do I pay for school, for private school for my children, what my husband does.  [S]he calls me black face.  She called me angry face. . . . [I]n all honesty, there is nothing I could have done."  *Id.* at 55:7-55:18.  Daniels-Rivera allegedly replied, "[S]he [Menzel] doesn't mean these things."  *Id*. at 55:7-56:5.  Inspector General Rosen was not at the meeting.

During a one-on-one meeting with Daniels-Rivera, about a week later, Daniels-Rivera again initiated a discussion about what Plaintiff could have done differently during the May 5,

2016 incident with Henzel.  Plaintiff responded that she could not fix the problem with Henzel because "this girl uses racial slurs towards me."  Pl. Tr. at 46:11-47:17, 227:20-228:3; Def Counter-56.1 statement ¶¶ 135, 136.  Daniels-Rivera allegedly responded that, "[A]s a manager, you have to accept [it]—as a manager, I have dealt with [it].  As a manager, I have experienced it. And as a manager, you have to deal with it."  Def's Counter 51.1 Statement 147; Pl. Tr. 34:10-18.

Although Plaintiff attended several meetings with Rosen "to address the issues that were happening in the office," Pl. Tr. 84:12-13, there is no evidence that Plaintiff raised any issues with Rosen about Henzel's alleged discriminatory behavior.  During those meetings, Rosen expressed views that could be described as favorable to Henzel and unfavorable towards Plaintiff.  At a meeting in April 2016 with Plaintiff, Mandel, and Glick to discuss the problems in the New York City office, including the high turnover rate among employees in the legal department and a heavy workload, Def's Counter 56.1 112; Pl. Tr. at 23:7-24:19, 27:8-14, Rosen allegedly turned to Plaintiff and said "oh, I know about you, you are the one with the fucking scowl face" who had been bothering Henzel and not following instructions, Pl. Tr. 24:7-19. Plaintiff interpreted the comment to be discriminatory as to her Haitian national origin, gender, and race.  *Id*. at 77:18-78:4. Rosen denies having made the statements. Dkt. No. 95-24: 138:13-18.  During the same meeting, according to Plaintiff, Rosen also allegedly complained to Glick for allowing one of his white employees to file a complaint against Henzel and for bothering her. Pl. Tr. at 180:10-13.

At one point during a subsequent meeting also to discuss issues in the office, Rosen referenced a complaint that Plaintiff and Manson had talked loudly outside of Henzel's office. According to Plaintiff, Rosen stated that Henzel and Plaintiff's supervisee Pak, who also would

have heard the "gabfest," could or should "get together and sue the heck out of [Plaintiff] and [Manson]." *Id.* at 78:12-15.

During a later meeting, Rosen stated that he had given Henzel "a wonderful recommendation" but heard she was leaving OMIG and that Plaintiff "g[ot] what [she] wanted." *Id.* at 85:3-6.  When Mandel and Glick informed Rosen that Henzel was not leaving, Rosen looked at Plaintiff and stated, "For your sake, I hope she doesn't leave, because if this continues, you can F-ing hit the door, walk out the door." *Id.*

**V.      Plaintiff's Performance Evaluations and Demotion**

Plaintiff received two probation reports from Daniels-Rivera: in July 2016 and in September 2016.

The reports and Plaintiff's performance were against a backdrop of Daniels-Rivera's awareness that the atmosphere in the New York City OMIG Office had been become increasingly less collegial.  Beginning in April 2016, Daniels-Rivera, along with Associate Counsel Dionne Wheatley, began conducting a series of training meetings intended to improve the atmosphere in the New York City Office of Counsel.  JDR Decl. ¶ 32.  As a result of these training meetings, which also involved Glick, Mandel, and Plaintiff, it was determined that it would be necessary for all New York staff to 1) attend monthly staff meetings and trainings; 2) keep their doors open; 3) greet each other in the morning; and 4) refrain from holding conversations in the common hallway.  *Id.* ¶ 33.  In an email sent on May 20, 2016 to Glick, Mandel, and Plaintiff, Daniels-Rivera stated, "As a follow-up to this Monday's New Supervisor's meeting, please see the attached list of items we agreed could be implemented by the manager's [*sic*] in an effort to move the office forward in a new, different, and more positive direction."  JDR Decl., Ex. L.  The email listed, among other things: 1) opening office doors; 2)

not holding conversations in hallways; 3) acknowledging birthdays; 4) sharing meals; and 5)
managers greeting staff during the day.  *Id*.

Before Plaintiff's first probation report in July 2016, Daniels-Rivera had raised questions
and expressed concerns about Plaintiff's adjustment to her supervision role both to Plaintiff and
to others.  In January 2016, Daniels-Rivera criticized Glick for not focusing sufficiently on
supervision of Plaintiff.  In March 2016, Daniels-Rivera expressed concern to Plaintiff about
Plaintiff's preparation of a probation report for a subordinate.  The May 2016 meetings were
directed, in part, to how Plaintiff was supervising and dealing with subordinates.

On July 14, 2016, Daniels-Rivera sent Plaintiff the first probation report ("July Probation
Report") Plaintiff received as an Associate Attorney.[4]  JDR Decl., Ex. G.  The email transmittal
to Plaintiff stated that Plaintiff's probationary period would be "extended to the beginning of
business on September 20, 2016 based on Plaintiff's planned vacation time and that if Plaintiff
missed additional days during the extension period, the probationary period would be extended
further."  *Id.*  The attached report conveyed low ratings of Plaintiff's work performance.  On a
scale of 1-5, it rated Plaintiff a "2" in each of the categories: Work Quality, Work Quantity,
Initiative/Resourcefulness, Reliability, and Supervision.  It rated Plaintiff a "1" in the category
Interpersonal Relations.  *Id*.  Among other things, the report stated that certain events that had
transpired in the office "illustrate a lack of care and good judgment and call into question
[Plaintiff's] ability to effectively supervise staff," including that Plaintiff had "shared
confidential information regarding other employees in the office with support staff and line
attorneys and [had] shared information discussed in confidential one-on-one meetings with staff
who were not present, and should not have been privy to the information."  JDR Decl. Ex. M.

---

[4] The parties dispute whether this report should be categorized as an "interim" report.  *See* Pl. 56.1 ¶ 23.  This
distinction is immaterial.

The report also stated that Plaintiff had "been overheard making disparaging remarks and less than complimentary remarks about the leadership in the office, specifically the General Counsel . . . in a common area and in the presence of other staff."  *Id*.  The report also noted that Plaintiff was not sufficiently reviewing the work of her supervisees.

The comment about "disparaging remarks" referred to an incident in approximately March 2016, when according to a report made by Pak to Daniels-Rivera in a telephone call, Pak overheard Plaintiff discussing Plaintiff's performance evaluation or probation report and commenting that Daniels-Rivera was "a B[bitch]."  Dkt. No. 95-7 ("JDR Tr.") 1789:3-11; JDR Decl. ¶¶ 26-27.  Plaintiff disputes both that she made the comment and that Daniels-Rivera's later evaluation of her conduct was accurate.

The report did not mention Henzel.

The report differed in emphasis and content from a draft probation report prepared by Glick and sent to Daniels-Rivera several months earlier.  Specifically, in January 8, 2016, approximately five months into her probationary promotion, Glick emailed a draft probation report for Plaintiff to Daniels-Rivera.  *See* Dkt. No. 95-2.  The draft report contained generally positive remarks, praising Plaintiff for a strong work ethic, strong organizational skills, working well with others, among other things.  On a scale of 1-5, Glick's report gave Plaintiff the highest or second highest rating in every category except "Supervision," as to which Glick rated her at a 3.  Glick's comments about Plaintiff's supervision skills noted simply that "[Plaintiff] has accepted her new responsibilities well and handles her only supervisee (to date) effectively)."  *Id*.

In response, Daniels-Rivera asked Glick to revise the draft report for Plaintiff and a similar report Glick had prepared for Mandel, to provide additional information regarding their performance as supervisors in the role as associate attorneys.  Pl. 56.1 ¶ 21.  The email from

Daniels-Rivera stated that "very little mention at all is made to [Plaintiff and Mandel's] transition and development as supervisors" and that "[t]he rating needs to support their performance in their new roles as supervisors rather than to pull from their previous performance as Senior Attorneys.  The objective is to provide a narrative that has more information about their specific performance during the review period, rather than a general more canned response."  JDR Decl., Ex. I.  The revised report prepared by Glick contained several additional sentences, spread across different categories of performance rating, which elaborated on Plaintiff's performance as a supervisor and provided generally positive comments.  Dkt. No. 95-5.

In the intervening time, Plaintiff exhibited behavior that, according to Daniels-Rivera, was concerning.  On March 16, 2016, Daniels-Rivera provided feedback on a draft report Plaintiff had prepared for Pak whom she supervised.  *See* Dkt. No. 95-3 at OMIG 882-884.  The email identified numerous deficiencies in the report, including, among other things, that: the numerical ratings Plaintiff gave to Pak appeared not to be justified by Plaintiff's written evaluation; the report did not contain sufficient detail about the specific work Pak had done; there were aspects of Pak's work that were not addressed at all by Plaintiff, such as her ability to adhere to established procedures and rules and to report to work on time; the report did not address several specific projects that Daniels-Rivera was aware that Pak had worked on; and Plaintiff had not outlined what steps she would take in the upcoming months to assist Pak in developing skills or improving performance.  *Id*.  Before sending the email, Daniels-Rivera called Plaintiff and told her, in an "unpleasant" phone call, that Plaintiff was not "doing this the way [she was] supposed to," that Henzel and Pak were "not happy" and that it was Plaintiff's "duty to correct the issues."  Pl. Tr. at 132:13-135:8.[5]  It was also in or about March 2016 that

---

[5] Plaintiff characterized the call as "demeaning," and "like a lashing."  *Id*. at 133:19-21, 136:20-21.

Daniels-Rivera received the telephone call from Pak indicating that Plaintiff had called Daniels-Rivera a "bitch" and discussed Henzel's probation report in public.

Glick prepared another draft probation report in July 2016.  Like Glick's January 2016 draft probation report, the report he prepared in July was also generally very positive.  *See* Dkt. No. 95-11.  The report rated Plaintiff a 4 or 5 in every category except "Supervision," as to which it still rated her a 3.  It commended Plaintiff for handling her caseload effectively, working with and assisting her supervisees, requiring minimal supervision, and being approachable, friendly, and knowledgeable, among other things.  *Id*.  Glick's July 2016 draft report ultimately recommended that Plaintiff complete her probation a month early and assume permanent status as an Associate Attorney.

Daniels-Rivera disagreed with Glick's assessment, and felt that elaboration on other areas of Plaintiff's work was necessary.  In an email sent to Glick on July 26, 2016, Daniels-Rivera expressed her concerns about Plaintiff and explained why she had drafted her own probation reports for both Plaintiff and Mandel.  Dkt. No. 80-14.  The email referenced the negative atmosphere in the office, the number of confrontations and less than positive interactions, the failure to take positive steps to address that atmosphere, and Plaintiff's performance on the specific issues for which she was responsible.  It stated that Glick's evaluations of the performances of Plaintiff and Mandel "only reference their supervision very generally, and lack[] specifics that support how they are adapting to their role as supervisors."  *Id*.  The email also noticed that Glick "mention[ed] that they follow all OMIG procedures and rules, when that is not, nor has it been the case."  *Id*.  She continued:

> As we both know, a lot has transpired in the NYC Office since January.  Dennis [Rosen] has been involved and has specifically confronted the NYC managers about what they are going to do about the atmosphere in the office.  There have been a number of confrontations, and less than positive interactions.  However,

your evaluation of them does not reference that at all, either in terms of identifying what specific things that they could not do or identifying any positive steps that they can or have taken to improve the office culture. Your evaluation does not reference at all any of the specific issues that they were asked to address and were responsible for working on.

*Id.*

Daniel-Rivera's email stated that Plaintiff was apparently not "really supervis[ing] [Pak]" but that "[Pak] is managed by" Glick. *Id.* The email further stated that "[f]rom what I understand, [Plaintiff] would like be more involved, but it is difficult for her, because [Pak] goes to you." *Id.*

Daniels-Rivera's report elaborated about specific deficiencies not touched on by Glick's reports. For example, while Glick's report praised Plaintiff for managing her cases well, being resourceful, and a skilled problem solver, Dkt. No. 95-11, the July Probation Report drafted by Daniels-Rivera commented that Plaintiff "lack[ed] care and good judgment," that she "need[ed] to devote and allow more time to review the work of her supervisees for accuracy," that she "lack[ed] responsiveness to certain requests made by management," and that although "as a line attorney she established good relationships with others," as a supervisor she was "most challenged" in the area of interpersonal relations, as to which Daniels-Rivera rated her a 1 on a scale of 1-5. Dkt. No. 80-7 at OMIG 906-908. They also reflect specific concerns Daniels-Rivera had that Glick evidently did not share or was not focused on. It is not clear, for example, whether Glick was ever informed, as Daniels-Rivera was, that Plaintiff was loudly discussing Henzel's probation report, or that she made a disparaging remark about Daniels-Rivera in public. Daniels-Rivera also noted, among other things, that: although Plaintiff had two supervisees—Dolman and Pak—she in fact was only supervising and training one of them (Dolman); she was not regularly updating her cases in the office's case tracking system; she was

not allowing for sufficient time for revision of her work and that of her supervisors in advance of scheduled hearings; she was not adequately attentive to policies and rules relating to office procedures, such as those about litigation, hearings, settlements, and processing time-off requests. *Id*.

Plaintiff and Daniels-Rivera met on July 11, 2016 for Daniels-Rivera to present the report to Plaintiff. Pl. 56.1 ¶ 149; Pl. Tr. at 140:15-141: 22. Plaintiff complains that she was not given time to review it in the meeting or take it with her to review separately, but that Daniels-Rivera informed her that she had to sign it on the spot. Pl. Tr. at 140:15–141: 22.

On July 26, 2016, Daniels-Rivera informed Glick that Plaintiff and Mandel's probation periods had been extended based on absences, and that the dates of the final probation reports would therefore change. Dkt. No. 95-3, OMIG No. 903.

On or about September 13, 2016, Daniels-Rivera provided Plaintiff a final probation report ("September Probation Report"). The report rated Plaintiff's work as predominantly unsatisfactory. JDR Decl., Ex. H. The September report rated Plaintiff, on a scale from 1 to 5, a "2" in each of the categories: Work Quality, Work Quantity, Initiative/Resourcefulness, Reliability, and Supervision, and a "1" in the category Interpersonal Relations. *Id*. The report stated, among other things:

> The quality of [Plaintiff's] work continues to be a concern in the context with exercising care and judgment over her own work and with staff in her role as a Supervisor. [Plaintiff] has continued to focus her attention on one of her Senior Attorney supervisees, and has not been actively involved in providing appropriate supervision and training to the other, newer Senior Attorney supervisee. Even after discussing this with her during the July meeting, and emphasizing her need to balance her time between both Senior Attorney supervisees, [Plaintiff] has continued to focus primarily on one supervisee. This has also been brought to her attention by the Deputy Counsel, who has taken on the responsibility of providing supervision and training to the newest supervisee.
>
> [Plaintiff] was also instructed to devote and allow more time to review both her work, and the work of her supervisees for accuracy. She was not actively involved

in a litigation case (Bella Dorman) assigned to her newest supervisee, did not allow sufficient time for her own review of the supervisee's work product, or for review by management. She also did not familiarize her Senior Attorney supervisee with the litigation process, either in advance or at the time the case was assigned.

Timely review of her supervisee's work product was also an issue in an administrative hearing (Lovedale), which resulted in a last minute adjournment, and intervention by the General Counsel. The issues in the case were not effectively evaluated by the assigned attorney, nor by [Plaintiff] as the supervisor, such that they were raised and could be handled in a timely fashion.

There were two examples (Allen's Taxi Brief and Metropolitan Home Health Care's prehearing motion) of her own work that illustrate her inability to effectively manage her time, and to handle competing assignments. These documents contained grammatical errors, and had issues with regulatory citations, as well as footnotes. Both documents had to undergo major revisions. As in the past, the final draft of the documents were not submitted for review by the Deputy counsel or the General Counsel in a timely manner and in accordance with Office procedure.

. . . .

[Plaintiff] is reluctant to accept responsibility and has not fully and promptly implemented administrative policies. There have been a number of recent occurrences in the NYC Office that involved problem situations that could have benefitted from skillful intervention by a supervisor. In one instance, she and the other managers were encouraged to greet staff in the morning, as a way to build better relationships and attempt to create an atmosphere of trust. Months after this was outlined as a next step, there was still one supervisee that [Plaintiff] made excuses and was not willing to greet.

*Id*.  The report's mention of Henzel was limited to the criticism that Plaintiff had failed to greet

Henzel properly when she arrived in the morning.

The report concluded with the remark: "It is recommended that [Plaintiff's] probation be

terminated, and that she return to her position as a Senior Attorney."  *Id*.

Prior to informing Plaintiff that she was being demoted to the position of Senior

Attorney, Daniels-Rivera informed Rosen of her decision.  *See* Dkt. No. 95-24 ("Rosen Tr.") at

151:20-153:12.  Rosen testified that Daniels-Rivera had informed him that "she felt there were

serious deficiencies still in [Plaintiff's] ability to make the transition from attorney to supervisor

and that there were some work-related issues, too, that I'm not familiar with in terms of her

actual legal work, but that she let me know what was going to happen." *Id.* at 152:6-13. Rosen stated that he "would have said, fine, I don't disagree" with Daniels-Rivera's decision, but that it was "her call," and that he did not have to "sign off" on the decision. *Id.* at 152:20-153:8.

Plaintiff signed the September Probation Report on or about September 26, 2016, and stated, "I completely disagree with the comments in this probation report. The report is untimely, and it was not completed by my supervisor. My signature merely represents receipt of this report." JDR Decl., Ex. H at OMIG 0926.

On September 14, 2016, Plaintiff received a letter from the Director of Human Resource Management at OMIG "to formally notify [her] that [OMIG] [was] terminating [her] services as an Associate Attorney" and that Plaintiff would be "reinstated to [her] permanent position of Senior Attorney." Pl. 56.1 ¶ 37.

Plaintiff complains that the probationary reports she received from Daniels-Rivera and her demotion reflected retaliation as a result of her complaints, to Chiesa in March 2016, and to Daniels-Rivera in May 2016, about Menzel's behavior toward her. She states that, after her complaints, she was given responsibility "to fix the issues that existed prior to me becoming a supervisor," Pl. Tr. at 181:18-182:9, and that "review of my work because very antagonistic," *id.* at 258:9-11. She also complains that after her demotion to Senior Attorney, she was assigned cases with insufficient time to adequately present at her hearings. *Id.* at 262:4-263:20.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the

governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  To defeat a motion for summary judgment, the non-moving party must demonstrate more than "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).

In cases involving claims of discrimination or retaliation, "an extra measure of caution is merited in affirming summary judgment . . . because direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial evidence found in affidavits and depositions." *Chiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockerfeller & Co., Inc.*, 258 F.3d 62, 69 (2d. Cir. 2001)) (internal citation omitted). However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)). "[T]rial courts should not 'treat discrimination differently from other ultimate questions of fact,'" *id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)), and even in the discrimination context, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb*, 521 F.3d at 137.

## DISCUSSION

The gravamen of Plaintiff's claims is that she was subjected to discriminatory and hostile conduct by Henzel, Plaintiff's subordinate, and that Plaintiff's superiors either condoned or failed to remediate this behavior and subsequently retaliated against Plaintiff for complaining about Henzel's behavior. Plaintiff's claims fail, however, because there is no evidence that her supervisors themselves, who made the employment decisions evinced discriminatory or retaliatory animus toward Plaintiff. The record does not create a triable issue that any action taken by Defendants—including negative probation reports and an ultimate demotion—was rooted in a discriminatory or retaliatory motive. Plaintiff also does not identify a genuine issue of fact creating a triable issue as to her hostile work environment claim. For that reason, judgment must be granted to Defendants on Plaintiff's claims.

## I.      Plaintiff's Adverse Employment Action Claims

Claims of adverse employment action discrimination under Title VII, NYSHRL, and

Section 1983 are governed under the familiar burden-shifting framework set forth in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this standard, Plaintiff must show that: (1)

she is a member of a protected class; (2) she was qualified for the position she held; (3) she

suffered an adverse employment action; and (4) the adverse action took place under

circumstances giving rise to an inference of discrimination.  *See Ruiz v. Cnty. of Rockland*, 609

F.3d 486, 491-92 (2d Cir. 2010) (Title VII); *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295,

305 & n.3 (2004) (NYSHRL); *Naumovski v. Norris*, 934 F.3d 200, 214-15 (2d Cir. 2019)

(Section 1983).[6]  "Once a plaintiff meets this initial burden, the burden then shifts to the

defendant to offer a legitimate nondiscriminatory reason for the termination."  *Id.* at 140. If

defendant does so, the burden returns to the plaintiff to show that the real reason for plaintiff's

termination was [her protected status]."  *Ruiz*, 609 F.3d at 492.

There is no dispute that Plaintiff is a member of a protected class, or classes, as a black

woman and a Haitian national.  It is further undisputed that Plaintiff suffered an adverse

employment action when she was demoted from the probationary position of Associate Attorney

to Senior Attorney.  However, Plaintiff has not met her minimal burden to put forth evidence

suggesting an inference of discriminatory motivation.  *See Littlejohn v. City of New York*, 795

F.3d 297, 311 (2d Cir. 2015).  Even if there were such an inference, Defendants have proffered

evidence of legitimate, nondiscriminatory reasons for Plaintiff's demotion, and Plaintiff has

failed to offer evidence that those reasons are pretextual.

---

[6] Indeed, to sustain a claim under a Section 1983 claim, a plaintiff has a "higher burden of producing evidence from which a jury could infer that the individual's discriminatory intent was *"but for" cause* of the adverse discrimination action." *Id.* Because the Court determines that summary judgment must be granted as to Plaintiff's Title VII claims, it need not address the higher burden under Section 1983.

A. <u>There is no inference of discrimination by any defendant</u>

There is no evidence giving rise to an inference of discrimination by either Daniels-Rivera or Rosen.  The Court addresses the claims arising from the conduct of those defendants, and their deficiencies, in turn.[7]

Daniels-Rivera was the decisionmaker in Plaintiff's demotion but Plaintiff does not identify any evidence that Daniels-Rivera, a black woman, who one year earlier had promoted Plaintiff in favor of others with better records or better scores, harbored any animus against her on the grounds of race, ethnicity, or national origin.  Those undisputed facts all tend to undermine Plaintiff's claim.  *See, e.g.*, *Eder v. City of N.Y.*, 2009 WL 362706, at *8 (S.D.N.Y. Feb. 12, 2009) (inference of discrimination is undermined where decisionmaker and Plaintiff are members of the same protected class); *Tucker v. N.Y. City*, No. 05 Civ.-2804, 2008 WL 4450271, at *5 (S.D.N.Y. Sept. 30, 2008), aff'd, 376 F. App'x 100 (2d Cir. 2010) (same); *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) ("Although each case must involve an examination of all the circumstances, some factors strongly suggest that invidious discrimination was unlikely. For example, when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her [or him] an invidious motivation that would be inconsistent with the decision to hire. This is especially so when the firing has occurred only a short time after the hiring"); *see also Campbell v. All. Nat. Inc.*, 107 F. Supp. 2d 234, 248 (S.D.N.Y. 2000) (where the interim period is under two years, "the same actor inference remains significant") (citing *Carlton v. Mystic Trans., Inc.*, 202 F.3d 129, 138 (2d. Cir. 1999)).  Plaintiff also does not claim, and there is no evidence, that Daniels-Rivera "critici[zed]

---

[7] "[I]ndividuals are not subject to liability under Title VII." *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (per curiam)

plaintiff's performance in ethnically degrading terms," or "[made] invidious comments about others in [Plaintiff's] protected group" or provided "more favorable treatment of employees not in the protected group," or engaged in any other activity that would give rise to an inference of discriminatory motivation. *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)).

Rather, Plaintiff's claim, as it was elaborated on at oral argument, is that Daniels-Rivera developed a discomfort with Plaintiff when—after having promoted Plaintiff—Plaintiff failed to behave in the manner Daniels-Rivera believed that Plaintiff as an African-American woman in the workplace should behave, by complaining about and failing to tolerate Henzel's alleged racism.  See Tr. 25 ("The discriminatory animus only arose when the Plaintiff showed that she was someone, a Black woman who would not accept discrimination and look the other way. . . . [T]here can be stereotypes of people, and so plaintiff didn't conform to a type of stereotype where she accepts discrimination, and that's the moment where Ms. Daniels-Rivera's animus comes from.").  Other than generalized complaints that Daniels-Rivera held her accountable for not sufficiently improving the atmosphere in the office, Plaintiff focuses on a single event in May 2016: Daniels-Rivera's alleged response when Plaintiff complained that Henzel had engaged in discriminatory conduct and called her "angry black face."  Daniels-Rivera, a black supervisor herself, allegedly said that she had experienced and had to deal with discriminatory comments, and that Plaintiff—now a manager—would have to "deal with" it as well.[8]  Plaintiff argues that in preparing negative reports on Plaintiff in July 2016 and later in September 2016

---

[8] Plaintiff also complains that Daniels-Rivera asked her to apologize to Henzel after the incident in which Henzel refused to accept an assignment from Plaintiff, Pl. Tr. 240:7-9, 324:20-23; that during the May 2016 meetings about issues in the office, Daniels-Rivera gave advice to Plaintiff about "how to ensure Robyn is not upset," Pl. Tr. 49: 2-9; that Daniels-Rivera wanted Plaintiff to arrange a farewell party for Henzel, Pl. Decl. ¶ 8; and that when Plaintiff asked if she was being demoted because of Henzel, Daniels-Rivera refused to answer, Pl. Tr. 170:3-5.

and in ultimately demoting her that month, Daniels-Rivera essentially adopted and acceded to Henzel's racist views or, looked at another way, demoted her because of Plaintiff's complaints about those racist views.

As a general matter, Title VII imposes liability on a corporate employer for the alleged racist views of a low-level employee (who is not in a position to make an adverse employment decision) in three circumstances: (1) the supervisor learns of discriminatory conduct of the low-level employee that is sufficiently severe and pervasive to create a hostile work environment and either knew of the harassment and failed to act or provided no reasonable avenue for complaint, *see Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 72 (2d Cir. 2000); (2) the low level employee makes comments exhibiting discriminatory animus that do <u>not</u> rise to the level of creating a hostile work environment but then <u>only</u> if the supervisor acts and takes adverse employment action against the plaintiff based on that animus in a manner that demonstrates the supervisor has been "manipulated by a subordinate who [has a discriminatory] motive and intended to bring about the adverse employment action." *Vasquez v. Empress Amb. Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016); or (3) where after being informed by the plaintiff of discriminatory conduct that again might not necessarily rise to the level of a hostile work environment (but that the employee reasonably and in good faith believes is a violation), the employer retaliates against the plaintiff for complaining about the co-worker's discriminatory conduct, in which case the complaint must be a "but-for" cause of the alleged adverse action by the employer," and not merely a "substantial" or "motivating" factor which is sufficient for status-based discrimination. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362, 348 (2013). Thus, Title VII gives rise to liability for a supervisor's failure to act in the face of discriminatory conduct only if the conduct has created a hostile work environment; if it has not,

the corporation is liable only if the supervisor takes an adverse employment action, either when it has been manipulated by such employee to take the action or in retaliation for complaints about the conduct of the low-level employee.

Plaintiff's status-based discrimination claim against OMIG based on Daniels-Rivera's conduct sounds in the second of these theories.[9]  Although ordinarily under Title VII the viability of an adverse employment discrimination claim turns upon the discriminatory motive or animus of the decisionmaker, *see Ruiz*, 609 F.3d at 491-92, there are circumstance where an employee who "is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive," may still have a claim of discrimination against her employer. *See Vasquez*, 835 F.3d at 272.  Those circumstance are circumscribed.  Under the cat's paw doctrine, the employee must show that the supervisor who has made the decision "has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action."  *Id.*  "Only when an employer in effect adopts an employee's unlawful animus by acting *negligently* with respect to the information provided by the employee, and thereby affords that biased employee an outsize role in its own employment decision, can the employee's motivation be imputed to the employer and used to support a claim under Title VII." *Id.* at 75.  For the cat's paw doctrine to apply, "the co-worker's discriminatory acts [must] proximately cause [the adverse employment action]," *Id.* at 274  (quoting *Velazquez–Perez v. Developers Diversified Realty Corp.*, 753 F.3d 265, 274 (1st Cir. 2014)), and "the individual shown to have the impermissible bias [must have] played a meaningful role in the [decision-making] process."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 143 (2d Cir. 2008).  The low-level

---

[9] Her retaliation claims and hostile work environment claims sound in the other two theories and will be discussed below.

employee's comments must be the "proximate cause of the adverse result." *See Menaker v. Hofstra Univ.*, 935 F.3d 20, 38 (2d Cir. 2019).

*Velasquez* itself is illustrative. The plaintiff complained to her employer that she was being harassed by a co-worker. The same day, the co-worker spoke to management and denied the claim, stating it was false and the relationship was consensual. The co-worker presented to the employer manipulated text conversations that made it appear as though he had been in a consensual relationship with the Plaintiff, as well as "racy self-taken photo" that management "considered proof that [the plaintiff] had been sexually harassing [the co-worker]." 835 F.3d at 272 at 271. Plaintiff "adamantly denied" that the evidence the co-worker had presented was accurate, and requested to see the photo, and offered to show her own text history to demonstrate what had really happened. Both her request and her offer were denied, and, without conducting any further inquiry or investigation, management terminated the plaintiff's employment for engaging in sexual harassment. *Id.* The Court held that the company was "negligen[t] [] in crediting [the co-worker's] accusations to the exclusion of all other evidence, and specifically declining to examine contrary evidence tendered by [the plaintiff] when it knew, or with reasonable investigation, should have known of [the co-worker's] retaliatory animus." *Id.* at 275. This negligence, the court reasoned, "caused [the co-worker's] accusations to form the sole basis for [the company's] decision to terminate [the plaintiff]." *Id.* The Court therefore held that the retaliatory intent of the co-worker could be imputed to the supervisor who himself had no retaliatory intent. The supervisor was "negligent in allowing [the co-worker's] false allegations, and the retaliatory intent behind them, to achieve their desired end." *Id.* at 274.

Here, Plaintiff has failed to offer evidence that Daniels-Rivera was manipulated by Henzel and that Henzel's discriminatory remarks were the proximate cause of, or had any role

whatsoever, in Daniels-Rivera's adverse employment decision.  The undisputed evidence is that Daniels-Rivera had expressed concern about Plaintiff's work product, supervision, and her ability to adjust to her new responsibilities consistently, from the time she was promoted through her demotion.  Those concerns, stemming initially from Plaintiff's lack of experience, were based on Plaintiff's supervision of subordinates generally (not just of Henzel, for whom Plaintiff did not have responsibility), on Daniels-Rivera's own experience and interactions with Plaintiff over the course of her probationary employment, and on the reports she received from others. There is no evidence that Henzel played any role at all in the formation of Daniels-Rivera's opinion about Plaintiff, which, as previously described, she expressed as a concern about Plaintiff's supervision skills and work product in her email response to Glick's January probation report draft; in her phone call and discussion with Plaintiff about Pak's evaluation; in emails to Glick about Plaintiff's work product; and in the July and September Probation Reports.

Indeed, unlike *Vasquez*, there is no evidence that Henzel (the alleged discriminatory actor) spoke to Daniels-Rivera (the decisionmaker) at all about Plaintiff, that Henzel expressed the desire to Daniels-Rivera that Plaintiff be demoted, or that Henzel had any awareness of the decision-making process for Plaintiff, much less a "meaningful" or "outsized" involvement in it. In these circumstances, Plaintiff's report to Daniels-Rivera of Henzel's alleged discriminatory remark and Daniels-Rivera's response that Plaintiff would have to deal with it does not give rise to a genuine issue of fact that Daniels-Rivera's decision months later not to extend Plaintiff's probation and to subsequently demote her was the product of Henzel's unlawful design.

Plaintiff's claims against OMIG based on Rosen's conduct suffer from similar, albeit not identical, flaws.  There is no evidence that Rosen criticized Plaintiff in terms that exhibited racial or ethnic bias, that he made invidious comments about others in Plaintiff's protected group or

that he engaged in any other conduct that on its face showed bias on grounds of race, ethnicity, or national origin.  There also is no evidence that Rosen knew of Henzel's alleged discriminatory conduct.  Rosen was not present for the meetings where Plaintiff complained of Henzel's discriminatory conduct and neither Plaintiff nor anyone else mentioned the "angry black face" comment to him.  Plaintiff's complaint, rather, appears to stem from the evidence that Rosen generally had an amicable relationship with Henzel but not with Plaintiff whom he criticized for the way that she treated Henzel,[10] and from a single comment that Rosen made to Plaintiff in April 2016 that Plaintiff had a "scowl face," had been not following instructions, and had been bothering Henzel.

That evidence fails to rise to the level of creating a genuine issue of fact that OMIG's decision to demote Plaintiff was the product of any discriminatory animus or that Rosen himself had any discriminatory animus or motive.  Although Rosen, as the Medicaid Inspector General, was the most senior officer in OMIG, there is no evidence that he played any meaningful role in the employment decisions with respect to Plaintiff.  Daniels-Rivera, the General Counsel, was the person who promoted Plaintiff.  Daniels-Rivera also was the person who prepared Plaintiff's probation reports and judged whether she had performed in the manner required for the position. Daniels-Rivera was also the person ultimately who decided that Plaintiff's performance did not satisfy the requirements of the position and who demoted her.  That decision followed two

---

[10] Plaintiff complains that Rosen and Henzel met between five and twenty times, Rosen Tr. At 94:3-19; 95:20-96:11; that he cursed at Glick for "allowing" [his] staff to file a complaint and bothering [Henzel]," Pl. Tr. 180:8-13; that Rosen told Henzel that he wanted to make the office more "professional" and that Rosen informed Henzel that there were procedures Henzel could avail herself of if she needed to file a formal complaint about the way she was being treated, Henzel Tr. 74:8-12; that he told Plaintiff that "he would recommend that [Henzel] and [Pak] get together and sue the heck out of [Plaintiff] and [Manson]" for "holding a gabfest in the hallway" which "bothers [Henzel]" Pl. Tr. 78:13-15; 79:19-80:4; ; and that when Rosen was under the mistaken impression that Henzel was going to leave OMIG, he told Plaintiff that "you get what you wanted," that it was "[Plaintiff's] fault that [Henzel] was leaving," and that "[f]or [Plaintiff's] sake, [Rosen] hop[ed] [Henzel] doesn't leave, because if this continues, you [Plainitff] can F-ing hit the door, walk out the door."  Pl. Tr. 84:24-85:22.

probation reports and several meetings with Plaintiff.  There is no evidence that Rosen had any

involvement during any part of that process or even knew about, much less was involved with,

Plaintiff's probationary reports.[11]  The Rosen comments about which Plaintiff complains were

made at meetings where Daniels-Rivera was not present, months before the employment

decision, and there is no evidence they were communicated to Daniels-Rivera.  Although Rosen

was informed of Daniels-Rivera's decision before it was finalized and communicated to Plaintiff

and apparently agreed with it, at that point—by all accounts—the decision was close to a *fait

accompli*.  Rosen gave the uncontradicted testimony that after Daniels-Rivera told her of the

planned demotion and of Daniels-Rivera's belief that "there were serious deficiencies still in

[Plaintiff's] ability to make the transition from attorney to supervisor and that there were some

work-related issues," Rosen Tr. 152:6-13, he responded that the decision to terminate was hers

but that he did not disagree and "expressed [his] understanding based on what she was telling me

that it made sense what she was doing."  *Id*. at 20-25. Rosen might have been able to reverse the

decision but there is no evidence that he influenced it.

There also is no evidence that the few comments that Rosen made to Plaintiff were

themselves the product of any impermissible animus.  The meetings Rosen had with Plaintiff and

the other supervisors in the office were about morale.  There were "issues in the office."  Among

those issues, apparently, were relations between Henzel and her fellow employees.  In that

context, the reference to Plaintiff's demeanor and attitude at work and her having a "fucking

scowl face," may have been crude or inappropriate, but there is no evidence that it was

discriminatory. *See, e.g.  Smith v. City of New York*, 2019 WL 2491536, at *11 (S.D.N.Y. June

---

[11] In particular, Daniels-Rivera has given the uncontradicted testimony that "Rosen did not review my July 7, 2016 Interim Probation Report or September 2016 Final Probation Report for [Plaintiff]" and "Rosen did not participate in my decision to extend and ultimately terminate [Plaintiff's] probationary employment as Associate Attorney." Daniels-Rivera Decl. 61-62.

13, 2019) (reasoning that "facially race-neutral" remarks did not "evinc[e] an intent to discriminate").   In particular, although Plaintiff herself connected the comment to Henzel's remark about an "angry black face," there is no evidence that Rosen himself knew of the earlier comment or was referring back to it.

In these circumstances, Plaintiff's claim against Rosen fails under the "stray remark" doctrine in this Circuit.  *See Lenzi v. Systemax, Inc.*, 944 F.3d 97, 112 (2d Cir. 2019).   In determining whether a remark is stray—in which case, in the absence of other indicia of discrimination, there is no inference of discrimination—courts in this Circuit consider four factors:  "(1) who made the remark (i.e., a decisionmaker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process."  *Id.*  Those factors are to be considered in their totality.  The weight to be ascribed to any one factor must depend on the facts supporting it as well as the evidence supporting the other factors.   A single stray remark by a senior officer, if uttered *to the decisionmaker at the time of the decision*, may give rise to an inference of discrimination even if the officer has no formal role in the decision, while a comment made in the somewhat more distant past by someone who was the decisionmaker may support a claim even if that comment is not formally made in the decision-making process.  But where, as here, the comment was not made by the decisionmaker and was not made to the decisionmaker or at the time of the decision, it is properly understood as a "stray remark" not giving rise to any inference of discrimination.  *See Campbell v. Alliance Nat'l Inc.*, 107 F.Supp.2d 234, 247 (S.D.N.Y.2000) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great

weight, *particularly if they were made temporally remote from the date of the decision*.")
(quotation omitted) (emphasis added); *Sergilus v. Covenant House Under 21*, 1999 U.S. Dist.
LEXIS 14254, at *6 (S.D.N.Y. Sept. 15, 1999) ("Stray remarks are not evidence of
discrimination if they are not temporally linked to an adverse employment action of if they are
made by individuals without decision-making authority.") (quotation omitted).

  In sum, the evidence, construed favorably to Plaintiff, does not give rise to an inference
of discrimination.  Rosen was not a decisionmaker with respect to Plaintiff, and his facially-race
neutral remark was not made in relation to the employment decision at issue.  Even viewed in the
light most favorable to Plaintiff, the evidence could not be construed by a reasonable juror to
reflect impermissible bias.  At most, it reflects coarsely expressed concern about Plaintiff's
demeanor and her relationship with Henzel, a concern Plaintiff believed to be unfair and
unwarranted.  But there is no evidence that favoritism or rudeness was the product of racial bias.

  Finally, as with Daniels-Rivera, Plaintiff's proffered "cat's paw" theory of liability also
fails as to Rosen.  While there is more evidence that Rosen may have favored Henzel, there is
insufficient evidence to create a triable issue that he was manipulated by her, and that such
manipulation was the "proximate cause" of Plaintiff's demotion.  *See Menaker*, 935 F.3d at 38.
As discussed, Rosen did not himself decide to demote Plaintiff, so any manipulation of him by
Henzel—the evidence of which is merely speculative—could not have caused it.  Moreover, and
as discussed below, the evidence shows that Plaintiff was demoted for legitimate, non-pretextual
reasons expressed by Daniels-Rivera.

B.  <u>The Evidence Shows a Legitimate, non-Pretextual Decision to Demote Plaintiff</u>

Even assuming, *arguendo*, that the evidence construed favorably to Plaintiff created a plausible inference of discrimination, the undisputed evidence shows that there were legitimate, non-pretextual reasons for Plaintiff's demotion.

Plaintiff was promoted on a probationary basis, ahead of persons with greater supervisory experience and higher civil service examination scores, to give her an opportunity to try to prove that she could adjust to a managerial experience.  The evidence establishes that, at least in the mind of Daniels-Rivera, she failed to do so.  The final probation report, provided to Plaintiff on September 13, 2020, detailed issues with both the quality of Plaintiff's work and with her purported inability to effectively manage her supervisees.  *See* JDR Decl., Ex. H.  There is no evidence that such report and the concerns expressed in it were pretextual or reflected other than Daniels-Rivera's own views and own evaluation.  It is consistent with Daniels-Rivera's concerns about Plaintiff's supervision reflected as early as January 2016 when Daniels-Rivera (before the "angry black face" comment) asked Glick to revise his draft report to provide an evaluation of the quality of that supervision.  It also is consistent with  Daniels-Rivera's July 11, 2016 probation report that states, among other things, that "[Plaintiff] has shared confidential information regarding other employees in the office with support staff and line attorneys"; that "[Plaintiff] has also been overheard making disparaging and less than complimentary remarks about the leadership in the office, specifically the General Counsel . . . in a common area in the presence of other staff; and that "[t]hese events call into question her judgment, demonstrate a lack of knowledge and skill necessary to be a supervisor, and also demonstrate a level of unprofessionalism that is not suitable for a new supervisor."  JDR Decl., Ex. G at OMIG 00000906.  It also is consistent with the numerous contemporaneous emails Daniels-Rivera sent

to Plaintiff and to Glick in July and August 2016, documenting her concerns about Plaintiff's

work product. *See* Dkt. Nos. 80-18, 80-19, 80-20.  In short, Daniels-Rivera consistently

expressed concern over Plaintiff's ability to execute her responsibilities as a supervisor. *See*

*Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) ("An employer's dissatisfaction with even a

qualified employee's performance may, of course, ultimately provide a legitimate, non-

discriminatory reason for the employer's adverse action."); *Cf. Zann Kwan v. Andalex Grp. LLC*,

737 F.3d 834, 845 (2d Cir. 2013) ("[I]nconsistent and contradictory explanations for the

plaintiff's termination . . ." can create an genuine issue of material fact as to whether proffered

reasons are pretextual).

Plaintiff disagrees with the content of these reports and Daniels-Rivera's evaluation of

her as well as with the process that resulted in her demotion, but there is no genuine issue that

Daniels-Rivera's views were not genuinely held.  *See St. Mary's Honor Center v. Hicks*, 509

U.S. 502, 515 (1993) ("a reason cannot be proved to be 'a pretext for discrimination' unless it is

shown both that the reason was false, and that discrimination was the real reason.") (emphasis

added).  The views of any supervisor must be based on their judgment of the requirements for a

job and the information acquired or possessed by them regarding the subordinate's satisfaction of

those requirements.  Daniels-Rivera's views were based on her own views regarding the

requirements for the job (that it required supervision skills, as she expressed to Glick) and her

experience with Plaintiff, formed over many months and by reviewing Plaintiff's work product,

as well as on the reports that were provided to her about Plaintiff's conduct in the office and her

supervision of others.  Plaintiff no doubt genuinely disagrees both with what was required of her

and with Daniels-Rivera's views as to whether she was able to discharge those responsibilities.

That is the meat of any employment dispute.  But, in the absence of discrimination,

management—not the Court—makes decisions whether to promote or demote.  The fact that
Plaintiff believes her position should have been made permanent while Daniels-Rivera believed
that Plaintiff needed to be demoted does not create a Title VII case or a claim of pretext
sufficient to entitle a plaintiff to a jury trial on whether the employee or the employer was right.
*See Auguste v. N.Y. Presbyterian Med. Ctr.*, 593 F. Supp. 2d 659, 666 (S.D.N.Y. 2009) ("[Plaintiff's
disagreement with [her supervisor's] assessment of her performance is insufficient to establish
pretext"); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 259 (E.D.N.Y. 2012), *aff'd*, 713
F.3d 163 (2d Cir. 2013) ("plaintiff's subjective disagreement with [his performance] reviews is
not a viable basis for a discrimination claim.") (quoting *Valentine v. Standard & Poor's*, 50 F.
Supp. 2d 262, 284 (S.D.N.Y. 1999)).

        Nor does Plaintiff's claim that Daniels-Rivera "violated usual OMIG policies to give
Milord-Francois negative probation reports and ultimately demote her," Dkt. No. 89 at 18-20,
support such a claim.  Plaintiff raised the alleged irregularities with the New York State
Department of Civil Service, which concluded that "[t]he agency appropriately extended
[Plaintiff's] probation due to absences and substantially complied with the rule by notifying [her]
on September 14, 2016, of [her] probationary termination."  Dkt. No. 79-3 at OMIG 0001051.
"Departures from procedural regularity . . . can raise a question as to the good faith of the
process," but only "where the departure may reasonably affect the decision," *Stern v. Trustees of
Columbia Univ.*, 131 F.3d 305, 313 (2d. Cir. 1997), and where it can be "shown that [the
irregularity] . . . [is] motivated by [discrimination or retaliation]."  *Bickerstaff v. Vassar College*,
196 F.3d 435, 453-454 (2d Cir. 1999); *see id.* at 453-56 (finding that an argument based on
procedural irregularities was deficient to prove discrimination where alleged irregularities neither
violated written procedures, nor were unprecedented, nor "changed the bottom line" result).

The deviations alleged here are not indicative of discriminatory motive. Plaintiff complains that Daniels-Rivera—not Glick—completed her probationary report, but Daniels-Rivera had direct experience with Plaintiff and received reports about her and, as General Counsel, had views about the position. She also prepared the reports for Mandel, a white man. A reasonable juror could not conclude her assumption of the responsibility to prepare the reports is reflects discriminatory animus. *See* Dkt. No. 80-14.

The same is true with respect to Plaintiff's argument that her probation was extended for fewer than 20 days of absences. Plaintiff argues that she was treated differently than Henzel who is white and who "had over 20 absences and no probation extension." But the two are not comparable. Plaintiff was not, like Henzel, a Senior Attorney. As an Associate Attorney, she was being evaluated as a supervisor. She was to be responsible for the management of other lawyers in the office. She thus was in an entirely different position from someone like Henzel who would not supervise others and whom she would be charged with supervising. Indeed, the very criticism Daniels-Rivera leveled against Plaintiff's job performance—that she was underperforming as a supervisor—would not even have been applicable to Henzel. *See, e.g. Mauze v. CBS Corp.*, 340 F. Supp. 3d 186, 205 (E.D.N.Y. 2018) (employees were inappropriate comparators where their "roles involved skills and expertise [Plaintiff] did not have"); *Ruiz*, 609 F.3d at 493 ("An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct.")

Finally, Plaintiff alleges that the 24 hours notice she was given of her demotion violated policy. But even if that were a violation, "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993). There is no evidence

to suggest that the notice given Plaintiff—which was described by the New York State Department of Civil Service as "substantially compli[ant]" with state policy, Dkt. No. 79-3 at OMIG 0001051—either affected the outcome of Plaintiff's demotion or indicated a discriminatory motive. *See Bickerstaff* 196 F.3d at 453-454 (2d Cir. 1999); *Skidmore Coll.*, 180 F. Supp. 2d at 342 (N.D.N.Y. 2001).

## II.   Retaliation

Plaintiff's allegations fare no better when they are framed as claims for retaliation rather than as claims for status-based discrimination.  Retaliation claims are "also measured under the three-step *McDonnell Douglass* analysis."  *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (citation omitted).  Thus, to state a *prima facie* case for retaliation under Title VII, NYSHRL, or Section 1983, a plaintiff must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 112 (2d Cir. 2019).  "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir.2001).  If the employer carries that burden, then the burden shifts back to the plaintiff, who must establish "that the employer's action was, in fact, motivated by discriminatory retaliation." *Id*.

Significantly, however, a plaintiff alleging retaliation in violation of Title VII must "establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer," and not merely a "substantial" or "motivating" factor which is sufficient for status-based discrimination. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362, 348 (2013).  "Once the plaintiff has established a prima facie showing of retaliation, the burden shifts

to the employer to articulate some legitimate, non-retaliatory reason for the employment action."
*Kwan*, 737 F.3d at 845.  "Upon the defendant's articulation of such a non-discriminatory reason
for the employment action, the presumption of discrimination arising with the establishment of
the prima facie case drops from the picture. For the case to continue, the plaintiff must then come
forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext
for actual discrimination."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)
(citations omitted).

Plaintiff's claims of retaliation rest upon the same two meetings at which Daniels-Rivera
was present plus the March 2016 meeting with Chiesa.  To recap, the May 2016 meetings were
held after Plaintiff had an incident where Henzel refused to accept an assignment; in responding
to questions regarding supervision issues, Plaintiff stated that Henzel had made discriminatory
remarks and relayed the "angry black face" comment that had been uttered months earlier.  In
March 2016, Plaintiff was interviewed by Chiesa about the complaint Dolman (a white
employee) had made about Henzel; Plaintiff also relayed the "angry black face" comment.  *See*
Pl. Tr. 69:12-23.  Plaintiff was demoted in September 2016.

The Court accepts that the evidence gives rise to an inference that Plaintiff was engaged
in protected activity.  The Second Circuit has recognized that "protected activity" includes
"informal protests of discriminatory employment practices, including making complaints to
management."  *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990).  "Such informal
complaints must be sufficiently specific to make it clear that the employee is complaining about
conduct prohibited by Title VII. Generalized complaints . . . are insufficient."  *Risco v. McHugh*,
868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012) (citing *Rojas v. Roman Catholic Diocese of Rochester*,
660 F.3d 98, 108 (2d Cir.2011)).  "To establish that his activity is protected under Title VII, a

plaintiff need not prove the merit of his underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).  Although it is notable that in each of these instances, someone other than Plaintiff initiated the meeting and Plaintiff only mentioned Henzel's conduct either when asked about other issues with Henzel (the Chiesa meeting) or in defense of her (Plaintiff's) own conduct and supervision issues (the meetings with Daniels-Rivera), the law does not require that Plaintiff initiate the complaint.  Plaintiff adduced sufficient evidence to show protected activity.[12]

Plaintiff has also adduced evidence to establish an adverse employment action, in the form of negative performance evaluations, which were followed by her demotion.  *See Whaley v. City Univ. of New York*, 555 F. Supp. 2d 381, 402 (S.D.N.Y. 2008) ("A negative evaluation, accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss, may constitute an adverse employment action.") (citations omitted).

The evidence to establish a but-for causal connection between Plaintiff's complaints to Chiesa or to Daniels-Rivera and the adverse employment action, however, is insufficient to create a triable issue.  As to Chiesa, not only was the comment temporarily distant, but there is no evidence that Plaintiff's complaint to Chiesa about Henzel was relayed to Daniels-Rivera or

---

[12] With respect to Rosen, there is no evidence in the record that he had any knowledge that Plaintiff had complained of Henzel's alleged discriminatory conduct.  Plaintiff's retaliation claims based on Rosen's conduct must be dismissed for that reason alone.  See *Lenzi v. Systemax*, Inc., 944 F.3d 97 (a prima facie case requires that the defendant "knew of the protected activity").  Plaintiff argues that Rosen's knowledge of Plaintiff's complaints can be inferred from his contact with Chiesa and Daniels-Rivera.  But that is pure speculation supported by nothing else in the record.  Daniels-Rivera and Chiesa both testified that Plaintiff never complained to them at all, let alone that they conveyed any complaint to Rosen.  The only case Plaintiff cites, *Mandell v. County of Suffolk*, is inapposite; there, a decision not to promote the plaintiff allegedly made in retaliation for testimony the Plaintiff made publicly before a county public safety committee and in an interview with a local daily newspaper—not privately in informal meetings.  316 F.3d 368, 374 (2d. Cir. 2003).  Moreover, in *Mandell*, the supervisor who made the decision to deny a promotion to the plaintiff did so on the recommendation of colleagues "two of whom had made statements indicative of retaliatory animus."  *Id.* at 384.  No such statements were made by any party in the instant case.  No reasonable juror could conclude that Rosen was aware of Plaintiff's complaints.

anyone else or played any role in the decision-making process.  Chiesa did not recall the complaint, Chiesa Tr. 60:4-8, and neither his contemporaneous notes taken from the call nor his report reflects it.  Dkt. No. 95-27.  Daniels-Rivera did not testify to having heard about the complaint.  JDR Tr. 228:10-13.

As to Daniels-Rivera, the evidence of a causal relationship is insufficient to create a triable issue.  The time between Plaintiff's comments to Daniels-Rivera in May 2016 about the "angry face" and "black face" comments and the the negative July Probation Report in July 2016, followed by the decision to demote her in September 2016 is sufficient to create a temporal connection.  *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action."); *id.* (stating that there is no "bright line" defining "the outer limits beyond which a temporal relationship is too attenuated" but that "five months is not too long to find [a] causal relationship."); *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d. Cir. 2002) (negative employment evaluations may be considered adverse employment actions)

However, even if this temporal connection is sufficient to make a prima facie case for retaliation under Title VII, the analysis does not end there.  *See Abrams*, 764 F.3d at 251 (even after Plaintiff makes a prima facie case, where Defendant proffers a "legitimate, non-discriminatory reason for its actions," the "final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination"). For the reasons stated in the previous section, Defendant has met its burden to establish that there were legitimate, non-pretextual reasons for Plaintiff's demotion. Plaintiff has therefore not shown that her complaints were the "but-for" cause for the adverse employment actions against her, or that

the legitimate, non-retaliatory reasons for her evaluations and demotion were pretextual, for all of the reasons stated in the previous section.  "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action."  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).  No such demonstration has been made.  When Daniels-Rivera reviewed Glick's evaluations of Plaintiff in February 9, 2016—before any alleged complaint by Plaintiff—Daniels-Rivera expressed dissatisfaction that the evaluations did not speak to Plaintiff and Mendel's performance as supervisors in particular.

The evidence is uncontradicted that Daniels-Rivera was focused on the requirements of the job and whether Plaintiff (or Mendel) satisfied them.  In July 2016, when Daniels-Rivera took it upon herself to write her own evaluations of Plaintiff and Mandel, she gave them each similarly negative reviews.  Subsequently, both Mandel's and Plaintiff's probationary periods were extended due to absences.  Dkt. No. 80-14; Dkt. No. 80-15.  There are no inconsistencies or contradictions in what Daniels-Rivera said about Plaintiff's job performance in her reviews of plaintiff, in her conversations with plaintiff, and in her declaration and testimony.

Indeed, there is no evidence that Henzel's comment, or Plaintiff's subsequent discussions of it with Chiesa and Daniels-Rivera played any role in Daniels-Rivera's decision to demote Plaintiff.  Rather, the uncontradicted evidence is that even after Daniels-Rivera's negative evaluation of Plaintiff, Plaintiff continued not to meet the expectations Daniels-Rivera had previously set for what was required for the job, both in terms of supervision and legal work-product.  For example, in an email from Daniels-Rivera to Plaintiff on July 25, 2016 regarding Plaintiff's evaluation of Dolman, she asked, "is there a reason why the narrative does not address

some of the issues we have discussed relating to [Dolman's] performance?" and noted that

Plaintiff had not included a "performance program for the upcoming evaluation year."  Dkt. No.

80-17; *See* JDR Decl. ¶¶ 45-47.  Daniels-Rivera also sent Plaintiff emails on July 20 and August

7, 2016, identifying shortcomings with legal briefs Plaintiff had prepared, including that one of

them "need[ed] to be reworked to remove redundancies, provide relevant chronologies and to

read more clearly," Dkt. No. 80-18, and as to the other, that Daniels-Rivera had provided

"extensive comments to assist [Plaintiff] in getting [the brief] ready for submission," and noting

that "[Plaintiff] need[s] to give [herself] a lot more lead time, and make sure that the

management of [her] time takes into account allotting sufficient time for review by

management," Dkt. No. 80-20.  Concerns such as those addressed in these emails were reflected

in Daniels-Rivera's September Probation Report, which noted weaknesses in both Plaintiff's

supervision and legal work product.  There is no evidence that these stated reasons are

pretextual, or that Plaintiff's report played any role whatsoever in the demotion.

### III. Hostile Work Environment

Finally, Plaintiff cannot prevail or create a genuine issue of material fact by reframing her

claims through the lens of a hostile work environment under Title VII, Section 1983, or

NYSHRL.

"The standard for showing a hostile work environment under Title VII, Section 1981,

Section 1983, and the New York State Human Rights Law is essentially the same." *Smith v.*

*Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2*, 798 F. Supp. 2d 443, 451 (E.D.N.Y.

2011) (citing *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 609 (2d Cir.2006);

*Patterson v. County of Oneida*, N.Y., 375 F.3d 206, 225 (2d Cir.2004)).

"To establish a hostile work environment . . . a plaintiff must show that 'the workplace is

permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive work

environment.'" *Littlejohn*, 795 F.3d at 320-21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17,

21 (1993)).  The test "has objective and subjective elements: the misconduct shown must be

severe or pervasive enough to create an objectively hostile or abusive work environment, and the

victim must also subjectively perceive that environment to be abusive." *Rivera v. Rochester*

*Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (quotation omitted). "In

determining whether a plaintiff suffered a hostile work environment, [the Court] must consider

the totality of the circumstances, including 'the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*,

510 U.S. at 23).  "As a general rule, incidents must be more than episodic; they must be

sufficiently continuous and concerted in order to be deemed pervasive."  *Alfano v. Costello*, 294

F.3d 365, 374 (2d Cir. 2002) (quotation omitted).

Plaintiff's claim turns on the legal question whether the episodic conduct of a single

subordinate can give rise to a hostile work environment claim by a more senior employee.[13]  At

least on the facts here, the answer is clear.  It cannot.  The hostile work environments prohibited

by Title VII are those that alter the "terms and conditions" of employment. *Harris*, 510 U.S. at

---

[13] Plaintiff cannot make out a hostile work environment claim based on any conduct by a
supervisor, including Daniels-Rivera or Rosen.  Although she believes and complained that
Daniels-Rivera was "micromanaging, bullying, degrading, [and] dehumanizing," *see* Dkt. No.
95-1 at 23, the hostile work environment prohibited by Title VII, Section 1983 and and NYSRL
is not any environment that a subordinate finds unpleasant.  *See Oncale v. Sundowner Offshore*
*Servs., Inc.*, 523 U.S. 75, 80 (1998) (Title VII is not a "general civility code" and "does not
prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion]
. . . because of . . . [a protected characteristic'"). Rosen may have been rude to Plaintiff and
expressed concern that she was not working well with Henzel.  But his conduct was not
discriminatory.  *Id.* at 25:14-15.  And indeed Plaintiff does not argue that it is the conduct by
Daniels-Rivera or Rosen that created the hostile work environment.

21; *see* 42 U.S.C. § 2000e–2(a)(1) (it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, *terms, conditions, or privileges of employment*, because of such individual's race, color, religion, sex, or national origin.") (emphasis added).  The workplace must be "*permeated* with discriminatory intimidation, ridicule, and insult" and that intimidation, ridicule, and insult must be "sufficiently *severe* or *pervasive* to alter the conditions of the victim's employment." *Littlejohn*, 795 F.3d at 320-21 (emphasis added) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Title VII does not create a "general civility code," *Oncale*, 523 U.S. at 81, and "not all workplace conduct that may be described as harassment affects . . . employment within the meaning of Title VII." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).

The law is clear that the conduct of a low-level or subordinate employee can—if sufficiently severe or pervasive—create a hostile work environment.  *See Bentley, LLC*, 935 F.3d at 92.  But in judging whether the level of discriminatory insult permeates the workplace and is sufficiently severe or pervasive to create a hostile work environment and affect the terms and conditions of employment, as with any discrimination claim brought under Title VII, "context matters." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006).  It is relevant who hurls or knowingly condones the insult and the context in which the insult is hurled.  *See Richardson*, 180 F.3d at 439 ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet . . . *by a supervisor* in the presence of his subordinates.") (quotation omitted) (emphasis added); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998) (A "supervisor's power and authority invests his or her harassing conduct with a particular threatening character").

It likewise is relevant whether the insult emanates from a single employee or more than one and whether racial or discriminatory insults are made even outside the plaintiff's presence. *See, e.g.*, *Whidbee*, 223 F.3d at 71 (evidence of statements made outside the Plaintiff's presence relevant to whether there is an overall hostile or abusive environment) (citing *Cruz*, 202 F.3d at 570; *Schwapp*, 118 F.3d at 111). A workplace where discriminatory or racial insult is routine, where it is made within and without the employee's presence, is one that is "permeated" with discrimination.

Finally, it also matters whether the insult is "sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quotation omitted). "A mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d. Cir. 1997). Rather, "[f]or racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, *there must be a steady barrage of opprobrious racial comments.*" *Id*. (emphasis added; internal quotation omitted). "Thus, whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment." *Id*. at 110-11 (internal quotation marks and citations omitted).

Plaintiff's evidence, construed favorably to her, does not satisfy these standards or establishing a hostile work environment. The claim is based on the conduct of a single subordinate employee, Henzel, over approximately a one-year period. During that period, Henzel made one comment that was objectively racial in nature—on July 10, 2015, she said that Plaintiff had an "angry black face." Beyond that, Plaintiff complains only of the following:

1. On one occasion, in Plaintiff's presence (but not directed toward her), Henzel expressed concern that she (Henzel) might be "killed" while attending a funeral in Harlem;

2. On another occasion, Henzel asked Plaintiff if she was going into an office to get drugs, and repeated to co-workers that Plaintiff might have a drug problem;

3. On another occasion, Henzel, outside of Plaintiff's presence, threatened to call security or the police on Mandel;

4. On yet another occasion, Henzel stated that Plaintiff "speak[s] well" but that Henzel "could do a better job."

In addition, Plaintiff offered the generalized testimony that Henzel "continuously" called her "angry face" and "scary face" in the relevant time period.

Although the three incidents above (and Plaintiff's general interaction with Henzel) bespeak an acrimonious relationship between Plaintiff and Henzel, they do not suffice to create a triable issue that there was a hostile work environment under Title VII.  Plaintiff did not contemporaneously report the "black face" or other comments in June or July 2015 because—in her admitted view—she could "ignore her at the time, because [Henzel] doesn't have power over me."  Pl. Tr. 68: 19-21.

The comment about crime in Harlem  is not  race-based on its face (it could be understood as a reference to a perception of neighborhood crime rates), but the Court accepts Plaintiff's argument that it should be interpreted and was interpreted by Plaintiff as a race-based allusion to the majority black population of Harlem.  Similarly, threatening to call security or the police on Mandel could be interpreted, in a certain context, to have racial overtones, although it is relevant (though not dispositive) that this statement was not made to Plaintiff and that Henzel

made inappropriate and hostile comments about others not in the protected group.  The argument that the other two comments reflect racial insult is more attenuated.  One can express the concern—or make the insult—that a coworker or supervisor is on drugs without racial overtones.  There is nothing more to this comment here.  As to the last comment, envy is alas an element of the human condition.  Considering the generally combative and difficult manner in which Henzel reportedly treated others in the office, *see infra* n.14, there is no genuine issue that these latter two comments were racial in nature.

Even interpreting the evidence in the light most favorable to Plaintiff, and even if these comments did meet the standard for objective racial hostility, they, combined with Henzel's overtly racist "angry black face" comment would still not create a triable issue that Plaintiff's workplace was permeated with discriminatory treatment that was either "extraordinarily severe" or "continuous and concerted" enough to "alter[] the conditions of [plaintiff's] working environment."  *Cruz*, 202 F. 3d. at 570.

The question then is whether Plaintiff's uncorroborated testimony that Henzel "continuously" called her "angry face" and "scary face" is, without more, sufficient to tip the balance and to create a genuine issue of material fact sufficient to give Plaintiff the right to a jury trial.  Based on the case law in this Circuit, it is not.

First, the testimony is itself conclusory.  *See Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) ("[T]here is no genuine issue created merely by the presentation of assertions that are conclusory") (citations omitted); *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir.1996) (the non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.") (internal citation omitted); Fed. R. Civ. P. 56(e) ("When a motion for

summary judgment is made and supported as provided in this rule, . . . the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth *specific facts* showing that there is a genuine issue for trial.").  Although it is relevant and admissible, it is insufficiently probative of whether the comments were uttered sufficiently often for a reasonable jury to find that they created a hostile work environment.

Second, "context matters."  *Burlington  N. & Santa Fe Ry. Co.*, 548 U.S. at 69.  The insults "angry face" and "scary face" are, on their face, race neutral. The Court accepts Plaintiff's argument that such comments could – depending on the context—be understood in a manner that is racially offensive if, for example, they are limited to persons who are members of a particular protected class.  But the term could also be understood in a manner that is not racially-offensive, as a reflection of a view that the subject of the comment is personally unpleasant or unhappy or angry.  The language does not define itself.  And that has particular force here where the undisputed evidence is that there was an unpleasant atmosphere in the office when Plaintiff held her position—for people of all races, ethnicities, and genders.  It is true that "when the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile work environment claim."  *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 388 (2d Cir. 2020).  For example, "[a] plaintiff may rely on incidents of sex-based abuse to show that other ostensibly sex-neutral conduct was, in fact, sex-based." *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 118 (2d. Cir 2010).  In this case, however, the mere fact that Henzel had on one occasion called Plaintiff "angry black face" does not create a genuine issue that subsequent, "continuous" insults that Plaintiff had an "angry face" were in fact racial in nature.  She did not identify the circumstances in which comments were made, such as whether they were made when Plaintiff was in fact upset, or if they were

gratuitous.  From her testimony, it is impossible to distinguish the comment from the other

abrasive conduct Henzel exhibited toward others in the office.[14]  Indeed, as noted, there is

evidence in the record that Henzel said that another white employee "makes angry faces." Dkt.

No. 95-27 at OMIG 2521.

The Second Circuit consistently has held that more is required to sustain a hostile work

environment claim.  In *Alfano v. Costello*, 294 F.3d 365, 370 (2d Cir. 2002), the Second Circuit

held that there was insufficient evidence for hostile work environment where, among other

things, supervisor instructed employee not to "eat carrots, bananas, hot dogs or ice cream on the

job because she did so in a 'seductive' manner," and Plaintiff discovered in her workplace

mailbox a carrot and two potatoes arranged as to resemble male genitalia, and a cartoon

depicting a subordinate of plaintiff making vulgar sexual remarks.  Identifying five such

incidents in a span of more than four years that evinced discrimination, the Court held that the

evidence "[fell] well below the threshold" established by other Second Circuit caselaw.  *Id*. at

379 (collecting cases).  Even though certain of these incidents could reasonably be found to be

"humiliating" and "plainly offensive," they were "too few, too separate in time, and too mild,

under the standard . . . to create an abusive working environment."  *Id*. at 380.

Similarly, in *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 59 (2d Cir. 2004), six

incidents in a one-month period, including a supervisor propositioning the plaintiff for sex, were

"not sufficiently severe or pervasive enough to create a hostile work environment" as they "were

---

[14] Notably, multiple employees described Henzel as creating problems in the office, and not only
with Plaintiff.  Glick testified that Henzel "is difficult to deal with" *See* Glick Tr. At 60:8-62:10;
Dolman testified that "all hell broke loose" when Henzel started working at OMIG, and that
"[s]he destroyed the entire culture of the office. She picked fights. She was very, very difficult to
deal with."  Dolman Tr. 44:23-45:2.  Dolman stated that Henzel "picked fights" with "every
single person in the office . . . she would pick on somebody, insult somebody . . . ." *Id*. 45:5-7.

few and occurred over a short span of time." *Id*. at 58-59.  *See also Hill v. Rayboy-Brauestein,* 467 F. Supp. 2d 336, 360 (S.D.N.Y. 2006) (insufficient evidence of hostile work environment where, in a one-and-a-half-year period, two supervisors called plaintiff "nigger," one also called her "retard" and another called her "moron"); *Stembridge v. City of New York*, 88 F. Supp. 2d 276, 286 (S.D.N.Y. 2000) (seven incidents over three years, several of which were explicitly racist statements by supervisors, were insufficient to create hostile work environment).  Although "the appalling conduct alleged in prior cases should not be taken to mark the boundary of what is actionable," *Whidbee*, 223 F.3d 62, 70 (2d Cir. 2000) (quoting *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 439 (2d Cir.1999)), the only allegations supported with specific facts—namely, Henzel's remarks that Plaintiff was an "angry black face" as well as her comments about Harlem, that she could perform a better job as Associate Attorney than Plaintiff, and that she allegedly threatened to call security on Manson—are not sufficiently severe, continuous, or concerted to sustain a hostile work environment claim.  *See Cruz*, 202 F.3d at 570.

By contrast, the cases in which summary judgment has been denied have involved more severe, continuous, and specific instances of alleged discrimination.  *See, e.g.*, *Schwapp v. Town of Avon*, 118 F.3d 106 (2d Cir. 1997) (in twenty months, ten to twelve instances of explicitly racist conduct by multiple co-workers); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (vacating summary judgment where a supervisor repeatedly used explicitly racist epithets in Plaintiff's presence, such as "repeatedly . . . mak[ing] loud racist comments—including use of the word 'nigger'—during [the plaintiff's] daily trips to the mailroom," as well as "constant[] . . . racially derogatory remarks, including references to 'spics' and 'colored people's time.'") (internal quotations omitted).

The Second Circuit's decision in *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d at 20-21, is particularly instructive.  There, although the Court vacated a grant of summary judgment, it stated that the decision was a "close call."   In a four-year period, two co-workers of the plaintiff (who is Hispanic) repeatedly uttered slurs at him—including calling him "spic" and chanting "what's that smell . . . there is Taco bell"—and *also* subjected the plaintiff to "extensive bullying and physical harassment."  *Id*. at 21.  The Court concluded that there was "barely" enough evidence, which included "*both* the use of ethnic slurs *and* the broader bullying and physical harassment" from which a reasonable jury could conclude that the plaintiff experienced a hostile work environment.  *Id*. at 23 (emphasis added).  The Court concluded that there *was* sufficient evidence on the basis of three reasons: 1) that the plaintiff's co-workers called him "spic" "probably . . . three times," and chanted another ethnic slur at least once, the factual circumstances of which were described in detail; 2) the plaintiff's testimony was corroborated by the testimony of other co-workers who provided further evidence about ethnically and racially hostile comments made outside of plaintiff's presence; and 3) in addition to evidence of the use of ethnic slurs, there was evidence in the record of bullying and physical harassment during the relevant time period.  *Id*.  The Court placed weight on the corroboration from other witnesses and that the evidence was not based on the testimony of the Plaintiff alone, and also that the evidence that was based on the Plaintiff's testimony was accompanied by supporting detail that permitted the inference of racial animus.

The evidence of a hostile work environment here falls well short of that in *Rivera*. Although mathematically the use of four slurs in four years (as in *Rivera*) can be compared to the use of one slur in one year (as here), there is no corroborating evidence from any other witness that heard Henzel call Plaintiff an "angry face."  Plaintiff was also not able to put any detail

around the comments about "angry face" to create a genuine issue that those alleged remarks were in fact racist.  And there is extensive evidence of issues and tension between Henzel and others in the office, including white employees, that are not discriminatory at all, which tends to undermine the claim that Henzel was discriminating against Plaintiff.  If in *Rivera*, there was "barely" enough evidence to support a hostile work environment claim, here the evidence falls well short of that which is necessary.

### IV. NYCHRL Claims:

Having dismissed Plaintiff's federal claims, as well as the NYSHRL claims which are governed by the same standards as the federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's NYCHRL claims for the following reasons.

A district court "may decline to exercise supplemental jurisdiction over a claim" once it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c).  In the course of resolving Plaintiff's Title VII claims, the court also its NYSHRL claims, as those are governed by the same substantive standards: "[C]laims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII."  *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n. 10 (2d Cir. 2011) (citation omitted). Therefore, the Court exercises its supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367 because the "values of judicial economy, convenience, fairness, and comity" favor resolving them simultaneously with the federal claims analyzed under the same standards. "Because the Title VII and the NYSHRL claims here arise from the same set of operative facts and because the same legal standards apply to both, requiring Defendants to re-litigate these claims in state court would be neither fair nor convenient, nor would it serve the interest of judicial economy."  *Vuona v. Merrill Lynch & Co., Inc.*, 919 F. Supp. 2d 359, 393 (S.D.N.Y. 2013).

However, claims brought under NYCHRL are evaluated under a different, more liberal standard. *See Mihalik v. Credit Aricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 108-09 (2d Cir. 2013) ("[the NYCHRL] provisions [must] "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws . . . have been so construed." (quoting N.Y.C. Admin. Code § 8–130); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir.2009). For that reason, the Court declines to exercise supplemental jurisdiction over Plaintiff's NYCHRL claims. "Although the Court has thoroughly analyzed Plaintiffs' claims according to the Title VII standard of liability, the Court has not yet invested the resources necessary to resolve the NYCHRL claims, which require application of a different standard with which the state courts are more familiar." *Vuona*, 919 F. Supp. 2d at 394. "The extensive discovery already taken is likely sufficient to enable Plaintiffs' NYCHRL claims to be evaluated in state court without any additional discovery, and Plaintiffs would not be prejudiced by dismissal since 'New York's C.P.L.R. § 205 allows a plaintiff to recommence a dismissed suit within six months without regard to the statute of limitations.'" *Id.* (quoting *Trinidad v. NYC Dep't of Corr.*, 423 F.Supp.2d 151, 169 (S.D.N.Y.2006) (other citations omitted). Accordingly, the Court declines to exercise jurisdiction over Plaintiff's NYCHRL claims, and those claims are dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment at Dkt. No. 76 is GRANTED as to Plaintiff's claims under Title VII, Section 1983, and NYSHRL.

The Court declines to exercise supplemental jurisdiction over Plaintiff's NYCHRL claims, and those are DISMISSED without prejudice.

SO ORDERED.

Dated: September 23, 2020
      New York, New York

                                           LEWIS J. LIMAN
                                  United States District Judge